Downey, Judge,
delivered the opinion of the court.
The claimants in this case seek recovery on 11 different items which are all the outgrowth of contracts entered into between them and the United States for work in connection with the excavation and construction of the approaches to the lock connecting the Mississippi River and Bayou Plaque-mine at Plaquemine, La. The several contracts are referred to in the findings of which they are made a part, and since to review them as a whole would very much lengthen this opinion without apparent profit, they will be discussed only as may be regarded necessary in the separate consideration of the various claims presented.
Claimants first seek to recover $4,815.22 deducted as expenses of superintendence and inspection under the contract of June 6,1905. (Findings I, II, and IV.)
Under this contract dated June 6,1905, approved and contractor notified of approval June 19, 1905, work was to commence within 60 days after notification of approval and be completed within five months thereafter. About the time the contractor was ready to commence or had begun work *377 an epidemic of yellow fever broke out, scattering the force employed, and on their application an extension of time was granted for “ a reasonable time.” The contractors proceeded with their preparations for the doing of the work, and, the epidemic having abated, they commenced or resumed work on the 10th day of October, 1905. The fact that they voluntarily commenced work on this date is sufficient to warrant the conclusion that the elapsed time was all the extension necessary on account of the cause stated and was reasonable. The contract was therefore to be completed within five months from that date, or before the 10th day of March, 1906.
Beginning with the 10th day of March, 1906, expenses of superintendence and inspection were charged against the contractor monthly until completion of the contract except that it was not fully completed until a few days after February 1, 1908, and no charge was made after the month of January, 1908. The expenses charged and deducted were first certified in itemized form by the assistant engineer on the work and then certified on the vouchers drawn as deductions by the engineer officer in charge, and the contractors then certified that the vouchers as drawn were correct and, so far as appears, made no objection to the deductions.
The contract provided that if the contractors should fail to complete the contract within the time limited it might be annulled, or in lieu of annulling the time limit might be waived and the contractor permitted to finish the work, in which event all expenses for superintendence and inspection due to the delay beyond the time originally fixed for completion should be determined by the party of the first part and deducted from any payments due or to become due the party of the second part.
The party of the first part in this contract was “ Clinton B. Sears, lieutenant colonel, Corps of Engineers, United States Army,” but he was contracting, as recited, “ for and in behalf of the United States of America.” If in course he was succeeded at any time by another officer as engineer in charge, representing the United States, questions for determination, under the contract, by the contracting officer were for the determination of the officer in charge as the *378 representative of the United States, and it can not be held, as contended by claimants, that they were, during the entire progress of the work, entitled to the individual determination of Col. Sears even though he may have been succeeded by another engineer officer as officer in charge.
Since it appears from the facts found that the contractors encountered some difficulties in the prosecution of the work in the bayou approach and excavated much more than the estimated amount of material, it is contended that there should have been an extension of time on that account, and that therefore a part of the charge for superintendence and inspection was improper; but we find no right under the contract to an extension of time for the reasons stated, and, indeed, it does not appear that any was then asked. It is also contended that it does not appear that the United States was actually put to the expense for superintendence and inspection as charged, and it is asserted that the employees for whose time charges are made were otherwise employed and in outside enterprises. It was not necessary, in our view of the situation, that it should be specifically proven, outside of the official certificates, that the United States was actually put to the expense charged, and there is no evidence which we can regard as even approximately sufficient to impeach the integrity of the official certificate of the engineer officer in charge. We conclude that there is no sufficient basis for a recovery on this item.
Claim is made for 7,910 yards of excavating, at 40 cents per yard, $3,164. This is the material which these contractors diverted to the purposes of the McGee contract, as shown in detail in Finding Y. There is nothing involved except a pure question of fact as to whether this excavating was paid for, and in the finding referred to it is said that this material was included in estimates made for which the contractors were paid. There is apparent in the presentment of the case some tendency to confusion as between the material taken by Burton & Co. for the purposes of the McGee contract and material taken from the area of the river approach by McGee & Co. before Burton & Co. entered into their contract, but it is not worth while to enter *379 into any discussion of the matter, since the finding is conclusive on the question. There can be no recovery on this item.
Claim is also made for excavating 16,914 cubic yards of material, under the contract of August 7, 1906 (Finding VII), at $1.05 per yard. This claim is disposed of by the findings, but it is perhaps proper to say that it is based on a calculation made by Prof. Dougherty from data furnished and made for the purpose of a presentation of the facts to this court. Prof. Dougherty’s skill as a mathematician has not been questioned by the court, but he was evidently laboring under difficulties, and it appears from the evidence that some matters essential to correct conclusions were not considered by him, possibly not presented properly. However that may be, the findings (Finding XIII) determine the quantities of material excavated under this contract and that, except as therein stated, the contractors were paid therefor. The conclusion on this item is against the claimants.
The next item is a claim for anticipated profits on 5,464 yards of excavating at 90 cents per yard, $4,917.60. The facts on which this claim is predicated are found in Finding XIV and, if entitled to recover, the amount claimed is found to be correct. It is the difference between the price the United States would have been compelled to pay for this excavating if these contractors had been permitted to do it and the price at which it is shown they could have procured it to be done by a subcontractor. That the profit would have been comparatively enormous probably does not affect the rights of the claimants.
It appears that when the water was let into the river approach inside the temporary levee for the purpose of testing the lock gates there was some washing from the banks and a deposit of sediment carried in with the river water. This deposit was over a considerable area, in a part of which it was plainly apparent that contractors’ work was not complete, since there were yet pile heads remaining to be cut off. Over this area the contractors were required to remove the sediment and cut off the pile heads. By reason of the ob *380 stacles presented by the pile heads this part of the work was necessarily tedious and perhaps not very profitable, but the contractors recognized their obligations in the matter and did it. The removal of the sediment from the rest of the area could be easily accomplished by a dredge, and the contractors demanded the right to remove it under their contract, but were refused. The theory presented is that there was yet work to be done by them in the smoothing up of the uneven surface of this area which they had already excavated, and that removal of the sediment was necessary before the smoothing up could be done, and that the contract provided for payment at contract price for the removal of any material from sliding or caving banks. The dispute hinges on contrary contentions as to whether the contractors’ work in the area in question had been completed. Controversies of this kind usually find the parties in reverse position, and, rather strangely here, the contractors are contending that they yet had to do that, which, as a matter of common knowledge, they are usually somewhat loath to do because “ smoothing up ” does not furnish much yardage in proportion to the labor involved.
■ This contract is not different from the usual run of such contracts, in that its whole import is to make the engineer officer the judge of the satisfactory performance of the contract. He, by its terms, was to give all lines, slopes, etc., and his decision was to be final on any question of the interpretation of the specifications in regard to shape or dimensions shown on the plans, and, as to all materials and work, “ the decision of the engineer officer in charge as to quality and quantity shall be final.” We think that as between the parties it was the province of the engineer officer in charge to determine whether the work in this area was completed according to plans or not, and even if he might not arbitrarily so determine, it is not satisfactorily shown that his conclusion was erroneous. He treated this area as a completed area, and the findings so refer to it. The conclusion is that the claimants are not entitled to recover.
The next claim is for anticipated profits on 3,973 cubic yards of material at 90 cents per yard, $3,575.70. This claim *381 arises by reason of the abandonment of certain parts of the work to be done under the contract of August 7, 1906.
Apparently many difficulties had attended the work of constructing this lock and its approaches. The lock walls had spread, causing the gates to stand apart at the top, engineers had differed as to the proper course in the premises, work by Burton & Co. had to be stopped on the 10th day of September, 1907, it was concluded that further pile driving would be detrimental to the work; and on the 28th of September, 1908, a further supplemental contract (Finding X) had been entered into between Burton & Co. and the United States providing for the elimination of certain parts of the work which they were to do and for the payment to them of $10,000 for the relinquishing of their profits on certain parts of the work and the expense of taking down and removing that part of their plant intended for use on the abandoned work, Burton & Co. releasing certain claims on account of the payment of the sum named.
At the time of the execution of this contract there were 7,946 yards of material within the original Burton contract, which remained to be excavated for approach walls, construction of which had been abandoned (Finding XIII). They were permitted to excavate one-half of this quantity and were paid the contract price therefor but were refused the right to excavate the other half.
This supplemental contract again provided for the payment of $1.05 per yard for excavating for approach and placing earth behind the lock walls, and with reference to the abandoned work it recited that “ in view of the fact that the said W. O. Burton & Co. are relinquishing their profits upon the unexecuted portion of the pile and concrete work of the river approach,” etc. The only theory apparent on which the contention of the Government as against the soundness of this claim can be sustained is that the abandonment of the construction of a part of the approach walls because of the danger from pile driving necessarily implied an abandonment of the excavation necessary for the walls and an abandonment by the contractor of his right to do that excavating or receive his fair profit therefor. We can *382 not say that this necessarily followed. Indeed, it would seem that the inclusion in the contract of a stipulation as to the class of work as to which the contractors abandoned their profits seems to exclude those things not stipulated. And if the Government’s theory is correct, it is a theory which would apply to the entire 7,946 yards, and made difficult of satisfactory explanation the course of the officer in charge in allowing the contractors to remove one-half of the total quantity and paying them for it. We think there is nothing in this supplemental contract which took from the contractors their right to excavate to lines, slopes, and grades as contemplated in the original contract. Upon this item the conclusion is that the claimants are entitled to recover $3,575.70.
The next item is a claim for $6,336 as anticipated profits on the excavation of 7,040 yards of material. The material in question in this item is material which caved from the bank into the Mississippi River on the 20th of November, 1908. It was material otherwise to be excavated by the contractors. The caving was caused by a flood in the river. The statement of the cause of the caving would seem to determine the conclusion. If, as contended by the claimants, they had a right to commence work at once after the execution of the supplemental contract of September 28, 1908, a contention we will consider in connection with another item, and if they were wrongfully prevented by the United States from so commencing work and if they had been permitted then to commence work they would have excavated this material before it caved into the river, the rights of the claimants would have been presented in a different light, but we have not found the facts in accordance with these suppositions. The conclusion must be against the claimants’ right to recover on this item.
The next two items are, respectively, claims for 136¿ barrels of cement at $2.70 per barrel, and 180.5 yards of sand at $1.45 per yard. The contract of September 28, 1908, obligated the United States to purchase this material rendered useless to the contractors by the abandonment of concrete work in which it was to be used. The only question is *383 as to the price. It is found (Finding XV) that the cement on the basis of the price to be paid Burton & Co. for concrete was worth $2.30 per barrel. By reason of an advance in price in the market it was then worth $2.70. It is concluded that the price, $2.30, which the contractors would have realized for the cement in the form of concrete had this concrete work not been abandoned is the proper basis of allowance. The finding fixes the value of the sand at $1.30 per yard. The claimants are entitled on these items, respectively, to $313.37 and $234.65.
Claimants next maintain their right to recover $15,253 as damages for disuse of plant for seven months. The period claimed for is from September 28, 1908, to May 1, 1909. The value of the use of the plant as found is stated in Finding XVI. We are of the opinion that no right to recover on this item is shown.
The theory of the claimants is that they were entitled, under the contract of September 28, 1908, to commence work immediately and that they were not permitted to do so, but were compelled to remain idle and under expense during the entire time stated. The contract of the date named did not contain any provision as to when work thereunder was to commence. If it stood alone as a contract for work to be performed, uninfluenced in its construction by any other circumstances, the conclusion would probably be justified that the contractors had the right to commence work as soon as they wished. But we are of the opinion that the contract in this respect must be construed in the light of the attendant circumstances and its purposes and that so construed it did not imply a right to commence work at once but, on the contrary, that there was a contingency upon which the commencement of work must depend. Work had been stopped some time before. The lock gates were not in shape to hold out water. While they were in that condition the temporary levee could not be taken away. Further excavating in the river approach could not be permitted for fear of weakening this temporary levee. It was because of this condition that, when the board of engineers concluded that filling should be placed behind the lock walls at once, the *384 contract of March 8, 1908 (Finding IX), was entered into with Burton & Co. under which they were paid for placing 24,203 yards of filling taken from borrow pits, at 95 cents per yard, when the required filling could have been supplied without additional cost for excavations yet to be made, levee included, if the work of excavating could be permitted to proceed under the contract therefor. This condition as to the gates had not been remedied when the contract of September 28, 1908, was made. The whole situation was necessarily known to Burton & Co. After the work of excavating in the approach had been stopped they had entered into a supplemental contract dated November 15, 1907 (Finding VIII), providing for an extension of time and relieving them of any charges for inspection and superintendence and in which it was recited that the board of engineers had reported that the removal of the temporary levee, which was a part of the excavating to be done, would be postponed until the back filling was completed and “ the lock is ready to be opened.” Bight was reserved to seek compensation for delay and disuse of plant and delay and disuse of plant was a part of the consideration for the payment of the $10,000 under the contract of September 28, 1908. Under these circumstances it borders on absurdity to say that in the face of the existing condition of the lock gates it was the intention that work was to commence immediately on the execution of that contract.
Thereafter, on February 1, 1909, Burton & Co. were notified that the lock gates would be in condition to withstand water pressure within 20 days, and that they must commence work within 30 days, and probably could commence sooner with safety. This is a rather clear indication of conditions at that time and of the contingency determining when work could be commenced. It does not appear that there was unreasonable delay on the part of the United States in putting the gates in such condition as to permit the commencement of the work.
It is now of importance to note, as found, that after this notice to Burton & Co. to commence work they objected, because the river was rising and likely to flood the work, *385 and they contended that under the contract their work was to be done after the river reached a given stage and on a falling river. And thereafter, and plainly as a result of their protest, they were notified that former instructions were so modified as to require them to begin work “when the gauge at Plaquemine reads 20 feet, which will be when the river falls.” Delay at this period then was permitted because of their protest and not caused by any refusal of the United States to allow work.to proceed. The river continued to rise until it flooded the area to be excavated, and when it receded conditions were such that Burton & Co. could not advantageously prosecute the work with the plant they had, and they were permitted to sublet the work, and work was commenced by their subcontractors on the 30th of April, 1909. It is thus apparent that there was no delay caused by the United States which can furnish a basis for this claim, and as to it, it is our conclusion that the claimants are not entitled to recover.
The next claim is for damages to towers and cableway in the sum of $7,427.80. The amount of damges is found to be $500. (Finding XVIII.) It was caused by the caving of the river bank caused, in turn, by high water in the river. The contract placed upon the contractor full responsibility for the safety of his plant. It is contended that this provision applies only to the period of the contract and any extension of that period by mutual consent and not when the contractor is compelled, against his will, to keep his plant subject to such a risk. We understand the claimants’ contention as to this item to revert to the theory that the contractors were entitled to commence work immediately on the execution of the contract of September 28, 1908, and that if so permitted they would have completed the work and removed this plant before the caving of the bank occurred. We have already discussed the claimants’ rights in this respect under this contract and need not repeat. We see no proper basis for the allowance of this item.
The last item is stated in the petition as “Balance due claimants on account of the 10 per cent reservations on their contracts, $7,514.50.”
*386 This statement of the claim, while correct in a sense, is not clear, and the facts appearing otherwise than as stated in the petition must be resorted to for explanation. There is no contention that the amount in question was not due the claimants as retained percentages under the 1906 contract. There was a larger sum than that admittedly due as retained percentages under that contract, but when settlement was made that sum was deducted as the amount alleged to be due the United States on a claim asserted in the nature of a counterclaim for the cost of 7,910 yards of filling material at 95 cents per yard (Finding XI), that amount of material being the same amount as that diverted by Burton & Co. to the purposes of the McGee contract (Finding Y).
A summary of the facts, chronologically stated, may aid consideration of a question which is perhaps not without its difficulties. When Burton & Co. entered into their contract of June 6, 1905, there was in existence, uncompleted but in process of performance, a contract between the United States and McGee & Co. for the placing of filling behind the wing walls of the lock. This contract had nothing to do with the excavation of the approaches. When Burton & Co. were ready to commence work under their contract it was found that a track used by McGee & Co. in transporting material from borrow pits was laid across a part of the area to be excavated by Burton & Co. and interfered with prosecution of their work, and to get McGee & Co. out of the way and at the suggestion of the assistant engineer on the work Burton & Co. entered into a contract with McGee & Co. to complete their contract for them, and Burton & Co. were permitted by the assistant engineer, with the knowledge of the engineer in charge, to use 7,910 yards of materials excavated from the approaches in the completion of the McGee contract. There is a controversy as to just where this material was taken from. In case it should be regarded as material, although its materiality for the purposes of this question is not apparent, it is found that a part came from the area covered by Burton & Co.’s 1905 contract and a part from the area covered by the 1906 contract. It was placed in part before the 1906 contract was executed and in part *387 thereafter. Under the contracts of Burton & Co. the material excavated by them was to be placed, to the extent, needed, behind the lock walls, and there was no modification of their contracts in this respect in writing with the approval of the Chief of Engineers or the Secretary of War. Burton & Co. profited by the transaction in that they were paid by the United States for excavating the materials and were paid by McGee Jj Co. for placing them as filling, and the United States suffered in that it paid Burton & Co. for the excavating and paid McGee & Co. for the filling; but there is no evidence that the transaction was in any way tainted with fraud, and it was then assumed that there would be more than enough materials to be excavated in the completion of the work than would be required to make the fills behind the lock walls.
Subsequently an engineer officer in charge was of the opinion that no more filling material should then be placed behind the lock walls. Differences of opinion arose, a board of engineers was appointed to investigate and recommend, and the board concluded that filling should be placed behind the lock walls at once, the condition of the lock gates rendered it unsafe to chance removing or weakening the temporary levee by taking materials which Burton & Co. could otherwise have been required, under their contract, to place behind the lock walls, and contract was made with them, March 8, 1908, to furnish from other sources and place behind the walls approximately 20,000 yards of filling material. Soon thereafter, in the same month, Burton & Co. were paid balance found due them under their 1905 contract without deduction or the assertion of any claim on account of the diversion of the' 7,910 yards of material to the purposes of the McGee contract. The contract of March 8 for filling was completed within the time limited, viz, four months after notice of approval, and Burton & Co. were paid thereunder for 24,203 yards of filling at 95 cents per yard without deduction or assertion of claim on account of the diverted materials. When the Chief of Engineers and the Secretary of War were informed of the diversion of this material to the McGee contract it is not shown ex *388 cept that it was before the execution of the contract of September 28, 1908. Indeed, this contract, which was approved by the Chief of Engineers and by the Secretary of War, recited the placing of the 24,000 yards of filling material under the contract of March, 1908, and under this contract Burton & Co. were paid $10,000 for the relinquishing of certain rights by them without, so far as appears, the assertion of any claim on account of the diverted material, and this contract apparently recognized their right to retained percentages. Afterwards, when final settlement was about to be made under the 1906 contract and contracts supplemental thereto, payment in full of retained percentages was refused and the sum in question was deducted as the cost to the United States of placing 7,910 yards of filling material at 95 cents per yard, on the theory that the United States had found it necessary to place that much more material under the contract of March, 1908, than it would had that amount of material placed by Burton & Co. behind the wing walls under the McGee contract been placed behind the lock walls. The amount deducted from the percentages due Burton & Co. is the amount paid Burton & Co. under the contract of March, 1908, for 7,910 yards of material at the price provided in that contract.
At the time that this deduction was made on final settlement under the 1906 contract, it is conceded that this amount, and more, was due Burton & Co. as percentages retained. The deduction, so called, was then a retaining of of $7,514.50 of percentages admittedly due. It was a retaining of an amount of percentages exactly equivalent to an amount paid Burton & Co. for 7,910 yards of the material placed under the contract of March, 1908, it being admitted that they actually placed the material and were paid only what they were entitled to receive under that contract. It is, then, a retaining from an amount admittedly due of another amount also admittedly due when paid. The justification is an alleged breach of contract, through another transaction, to the damage of the United States in that amount. It would seem that since the claimants are coneeded to be entitled to this money, considered as retained percentages, *389 the burden must be on the United States to establish its right to withhold it to compensate for alleged damages by way of breach of contract.
It is perhaps well to consider first whether there was a breach of contract resulting in a liability. The contract of 1905 contemplated the placing behind the lock walls of all excavated materials fit for the purpose. The contract of 1906 contemplated the same disposition of the materials except that it seems plainly apparent that there would be an excess of materials to be “ wasted.” When Burton & Co. made their contract with McGee & Co. at the suggestion of a representative of the United States, the primary object was to get McGee & Co. out of the way so that Burton & Co. could proceed with their contract, a consummation desirable from the standpoint of the United States. There could be no object in Burton & Co. taking over at 25 cents a contract under which McGee & Co. were being paid 59 cents if they were to be required to get the materials from outside sources, and indeed if they were to do so and retain the plant in place or install another for doing the work from the same source, nothing would be gained, since they would be with their plant as much in the way of the progress of excavation in the approaches as McGee & Co. had been. But by permitting Burton & Co. to complete the McGee fill with materials taken from the area to be excavated, the work of excavating would be facilitated and the McGee contract completed at the same time. And when Burton & Co. were permitted to take those materials for that purpose it was believed by the officer in charge that there was much more material to be excavated than would be required for the fills behind the lock walls. But for a contingency not then to be anticipated this view would no doubt have been verified and there would have been no occasion for the contract of March, 1908, with Burton & Co. for filling from outside sources, for it appears that when that contract was made to meet a determined necessity the material could not be taken from the area to be excavated, not because it was not there, but because, on account of the condition of the lock gates, it could not then be moved with *390 safety. This condition could not reasonably be anticipated, and when the diversion by Burton & Co. to the McGee contract of the 7,910 yards of material was permitted there was no reason to believe that its diversion would ever entail any additional expense on the United States.
A contract is always susceptible of modification or amendment by the parties to it, and this contract did not differ in that respect from the ordinary contract, unless it be by virtue of some provision in it or the law applicable to it. It is contended that it could only be modified by a contract in writing approved by the Secretary of War, and that any departure from its terms, even though with the approval of the engineer officer in charge, would constitute a breach if not agreed upon in a writing so approved. íhe contracts of 1905 and 1906 contained the same provision on this subject, as follows:
“ If at any time during the prosecution of the work it be found advantageous or necessary to make any change or modification in the project, and this change or modification should involve such change in the specifications as to character and quality, whether of labor or material, as would either increase or diminish the cost of the work, then such change or modification must be agreed upon in writing by the contracting parties, the agreement setting forth fully the reasons for such change and giving clearly the quantities and prices of both material and labor thus substituted for those named in the original contract, and before taking effect must be approved by the Secretary of War: Provided, That no payments shall be made unless such supplemental or modified agreement was signed and approved before the obligations arising from such modification was incurred.”
We are well aware of the rule laid down in the Plvmley and other cases as to the effect of contract provisions similar to this, but it seems clear to us that this transaction is not within the rule or the quoted contract provision. That provision, in its first clause, recognizes the fact that it may become advantageous or necessary to make changes, and the implication is that there may be changes which may be informally made, but if they change the specifications as to character and quantity so as to increase or diminish the cost of the work they must be made with the stated formality, giving the quantities and prices substituted for those named *391 in the contract, and, according to the proviso, before the obligations arising from such modification were increased.
These contracts involved other work than excavating. So far as the excavating was concerned, the excavating of the approaches was the primary object and the basis of payment; Coupled with it was the obligation to place excavated materials behind lock walls to the prescribed grade. The modification involved no increased cost as to the excavating. It involved directly no increased cost as to filling. Since there were plainly many more yards of materials to be excavated than could be used in the fills, there was at the time no possibility apparent that the diversion of this quantity of material could ever entail any expense on the United States. It was then apparently but a part of an available surplus necessarily to be wasted. The transaction was “ advantageous,” in that it was designed to facilitate progress; its placing behind the lock walls was by one of the engineers in charge during the time regarded as detrimental, and so far as human foresight could see it involved no increase of cost. That it did involve increased cost was not primarily due to the diversion under the circumstances existent at the time it was authorized, but was .due to the fact that when, after a controversy between the engineers, it was concluded by a majority that the filling should be placed at once, the materials which it was assumed would be available for the purpose and which would otherwise have been available could not be taken because of wholly unanticipated defective condition of the gates. And in this transaction there was no “ substitution ” of labor or material, and the transaction in itself clearly imposed no “ obligations arising from such modification.” There could hardly be said to be error of judgment on the part of the officer in charge in permitting the diversion, for human judgment can not be expected to consider contingencies wholly outside those reasonably to be anticipated. We think this was not such a modification of the contract as was required to be in writing with the approval of the Secretary of War, and it is shown that it was authorized by the representatives of the United States in charge of the work. What effect is to be given to the fact *392 that it must have been known to the Secretary of War in all its consequences when he approved the contract of September 28, 1908, we need not here discuss. There was, in our opinion, no breach of this contract.
But if this conclusion should not be justified there are other features of the transaction for consideration.
The diverted material was taken in part from the area covered by the contract of June 6, 1905, and the diversion as to all the material necessary for the purposes of the McGee contract was authorized in connection with the performance of that contract and long before the execution or even the letting of the contract of 1906. Full settlement was made with Burton & Co. under the 1905 contract, with no deduction or claim on account of any breach thereof except as to expense of superintendence and inspection. If the diversion was a breach of the contract of 1905 to the damage of the United States, the theory upon which the deduction was made, we think there was no authority in the accounting officers or the department to determine the damages and arbitrarily withhold them from amounts due under the contract of 1906.
When the contract of March 8,1908, for the placing of filling from outside sources behind the lock walls was entered into, this so-called diversion had already occurred, and the void where the 7,910 yards were not was as glaringly in evidence as ever. Burton & Co. were awarded the contract without competition, since they were on the ground prepared to do the work, and they were paid in full for 24,203 yards of filling without deduction or claim of right of deduction. For every 7,910 yards of this material so placed they were paid $7,514.50, the amount in question, and it was never and is not now contended that they were not entitled to it under that contract. This particular sum rightfully paid under that contract is withheld from money rightfully due under another contract. If it retains its identity as a specific sum of money it clearly could not be so deducted, since the sum paid and the money from which it was deducted were both rightfully due. If it resolves itself into a measure of damages for an alleged breach of the 1905 con *393 tract, the theory adopted, we are of the opinion that after settlement in full under that contract there was no authority to deduct it from money due under the 1906 contract. Camden Iron Works v. United States, 50 C. Cls., 191, and cases cited.
It is found that the Chief of Engineers and the Secretary of War were informed of this diversion before their approval of the contract of September 28, 1908, and we have called attention to the fact that the placing of this material by Burton & Co. under the contract of March 8, 1908, is recited in the contract referred to. While there is in this contract no express waiver of any claim against Burton & Co. on account of this diversion, it was declared to be a modification of the contract of 1906 as already modified, and was for the purpose of providing for changes in the work yet to be done and adjusting with Burton & Co. as to transactions occurring previous to that time. It recognized that Burton & Co. were entitled to an “equitable recompense” of $10,000 for relinquishing anticipated profits on abandoned work, including therein a release of all claims by them on account of previous changes in plans or delays or for work done “ except for payment of retained percentages now held by the United States.” After thus modifying the contract of 1906, apparently attempting to adjust ail differences with Burton & Co. up to that time, finding that Burton & Co. were equitably entitled to receive $10,000, recognizing that in addition thereto they were entitled to receive the retained percentages and thereafter paying the $10,000, we do not think that, in the absence of fraud or mistake, neither of which is shown, the United States was entitled to thereafter declare a breach of contract, determine the measure of damages therefor, and deduct the amount thereof from money admittedly earned under the contract and due and unpaid.
These last suggestions, following discussion of the question as to whether there was in fact a breach of contract, have not been elaborated. Their brief mention has seemed sufficient under the circumstances. Other views of the transaction which might be presented would seem but to add reasons for a conclusion apparently already well founded. Upon the *394 whole situation as presented without necessity for determining where is found the best basis for the conclusion, we are of the opinion that the claimants are entitled to recover this item.
On the whole case the claimants are entitled to judgment for $11,638.22, and it is so ordered.
Campbell, Chief Justice; Booth, Judge; and Barnet, Judge, concur.